## SMITH *v.* JACKSON

[No. 441, September Term, 1964.]

*Decided October 15, 1965.*

The cause was argued before PRESCOTT, C. J., and HAM-MOND, MARBURY, OPPENHEIMER and BARNES, JJ.

*Calvin Douglass,* with whom was *Donald G. Murray* on the brief, for appellant.

No brief and no appearance for appellee.

HAMMOND, J., delivered the opinion of the Court.

This appeal is from an order of Judge Cullen in a bastardy proceeding brought and decided under the provisions of Code (1964 Supp.), Art. 16, Sec. 66A, *et seq.,* finding the appellant, Smith, to be the father of a child born out of wedlock, and directing payment of $15.00 bi-weekly to the mother for the support of the child, and a counsel fee and costs.

The appellant challenges the sufficiency of the evidence and the refusal of Judge Cullen to admit a report of a laboratory test when the maker of the test was not present, and also argues that the opinion of a doctor that the appellant was "relatively infertile" required a finding that he was not the father of the child, despite other evidence that he was.

All of these contentions must be rejected.

The mother, Carolyn Jackson, testified as follows: That on July 18, 1961, when she had just turned eighteen, her girl friend got married to Duke Parker and after the wedding Parker introduced Carolyn to the appellant Smith, who was a policeman walking his beat on the four p.m. to midnight shift, and it was arranged that the Parkers and Carolyn would pick up Smith at

his home after he had changed to civilian clothes about midnight and "go out on the town". The four went to several night clubs, ending at the Club Casino, where they stayed until it closed. Carolyn had drinks of alcoholic beverages. When they left the Club Casino, the Parkers drove Carolyn and Smith to Smith's apartment, where she had left her sweater. The Parkers drove off without leaving their car, and Carolyn and Smith went in and she spent the night and had sexual intercourse with Smith. She and Smith had intercourse on several occasions thereafter. In September the doctor told Carolyn she was pregnant and almost immediately she telephoned Smith, who came to her mother's house where she lived and, when assured that Carolyn was certain that the baby was his, said he would help her with the baby. Carolyn said Smith mailed her a money order for fifteen dollars every two weeks for a time before the baby was born and, before the event, gave her forty dollars towards the eighty-dollar cost of having the child at the Provident Hospital. She saved the envelopes in which the money had been sent and offered one in evidence. After the baby, a girl, was born on March 31, 1962, Smith brought the child a bassinet, some clothes, and from time to time baby food and milk.

Mrs. Parker corroborated the fact that Smith and Carolyn went into Smith's apartment together early in the morning of July 19, 1961, as the Parkers drove off. Carolyn's mother testified to Smith's acceptance of Carolyn's assurance that he was the baby's father, to his giving her forty dollars for the accouchement and to his bringing the bassinet, clothes and food for the baby.

Smith testified that he had driven Carolyn straight home from his home, without having gone in, when the Parkers left them in the early hours of July 19, that the few hours of that evening was the only occasion he had seen her or talked to her until after the birth of the baby, and that he had never at any time had relations with her and had never given her any money. He did admit that the envelope introduced into evidence as bearing money from him before the child's birth bore his return address and was directed to Carolyn in his handwriting, and also admitted he had taken milk and food to the baby. His explanations of why he wrote and as to furnishing supplies for

the child certainly could have been found evasive, unconvincing and unpersuasive by the trier of fact.

Code (1964 Supp.), Art. 16, Sec. 66F b, provides that "* * * the burden is upon the petitioner or complainant to establish, by the weight of evidence required in other civil cases, that the defendant is the father of the child or children in question." We are fully convinced that Judge Cullen properly could, as he did, find that the claimant here had met that burden.

Smith, in an effort to show he was sterile, offered as a witness a general practitioner of medicine, who was asked whether he had referred Mr. Smith to a medical laboratory and had thereafter received a report from the laboratory. Judge Cullen refused to permit the doctor to testify as to the report because he had not made the tests on Smith and the person who had was not present to show what the tests were, how they were made, nor for cross-examination. Smith's lawyer then asked for a postponement (which was later granted) in order to produce the person who made the tests, and the general practitioner was excused.

We find no error for several reasons. For the proof to be conclusive it is necessary that sterility at the time of the alleged act of intercourse be established, *Lucas v. Williams*, 218 Md. 322, and no proffer was made that this was to be the proof. The doctor had not made the tests sought to be relied on, and the petitioner was entitled, at the least, to the opportunity to cross-examine whomever had made the test. See *Brunson v. Director*, 239 Md. 128, and by analogy Code (1964 Supp.), Art. 16, Sec. 66G, relating to blood tests in bastardy cases, which provides that such tests may be made by laboratories in this State, selected by the court, and if the tests establish definite exclusion, the reports thereof "* * * shall be accepted as prima facie evidence of the results of such tests," subject to the safeguard that "when the tests are admitted in evidence, the laboratory technicians who made them are subject to cross-examination by all parties to the proceedings." Finally, the testimony sought to be offered at the first hearing was admitted at the adjourned hearing.

At the trial on October 5, 1964, after all the testimony had been concluded except for the medical testimony desired by

Smith, Judge Cullen adjourned the hearing in order to afford Smith the opportunity to bring in "the man who made the examination." When the hearing resumed ten days later on October 15, Smith offered as a witness a doctor specializing in urology and certified by the American Board of Urology who had recently tested Smith's sperm count and found it low to the point of putting him into "the relatively infertile group," by which he meant that it would be possible for Smith to be a father but unlikely—"he falls into the group of people who would most likely be infertile, rather than those people who would most likely be fertile." [1]

The doctor testified further that the condition of infertility he had found could come on suddenly, although usually it is a condition which exists from puberty until the end of a man's active sexual period.

Under the rules established by the *Lucas* case, the doctor's testimony did not require a finding that on July 18, 1961 Smith could not have fathered a child in the face of other evidence that in all likelihood he had.

*Order affirmed, with costs.*

---

1. Smith testified that he had no children although he had been married from 1946 to 1958; Carolyn testified Smith had told her he had one child by "his first wife" and that he kept a picture of the child on the dresser in his living room.