578 A.2d 761

**Elaine A. TAXIERA**

v.

**Frederick C. MALKUS, Personal Representative of the Estate of Levi Travers Brown, Jr.**

**No. 144, Sept. Term, 1989.**

Court of Appeals of Maryland.

Sept. 5, 1990.

472

George J. Goldsborough, Jr. (Mitchell J. Cornwell, Goldsborough & Tolley, all on brief), Easton, for appellant.

John Wheeler Glenn (Avery B. Berdit, Preston & Glenn, P.A., all on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, McAULIFFE and CHASANOW, and ADKINS *, J. (retired).

---

* Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Art. IV, § 3A, he also participated in the decision and the adoption of this opinion.

MURPHY, Chief Judge.

This case involves the right of an after-born illegitimate child to establish the paternity of her deceased putative father.

## I.

On July 30, 1987, Elaine Taxiera, a Delaware resident, filed a declaratory judgment action in the Circuit Court for Dorchester County against Frederick C. Malkus, the Personal Representative of the Estate of Levi Brown, Jr. Elaine sought a declaration under Maryland Code (1974), § 1–208 of the Estates and Trusts Article, that Levi was the father of her illegitimate daughter, Leah, who was born four months after Levi's death. Section 1–208(b) provides that a child born to parents who have not participated in a marriage ceremony with each other shall be considered to be the child of his father only if the father:

"(1) Has been judicially determined to be the father in an action brought under the statutes relating to paternity proceedings; or

(2) Has acknowledged himself, in writing, to be the father; or

(3) Has openly and notoriously recognized the child to be his child; or

(4) Has subsequently married the mother and has acknowledged himself, orally or in writing, to be the father." [1]

On November 12, 1987, during the pendency of the declaratory judgment action, Elaine filed a "Complaint to Establish Paternity" in the Circuit Court for Dorchester County, pursuant to Code (1984), Subtitle 10 entitled "Paternity Proceedings," §§ 5–1001 through 5–1048 of the Family Law Article (the paternity statute). In this action, Elaine asked

---

**1.** Section 3–107 of the Estates and Trusts Article provides that a child of a decedent who is conceived before the defendant's death, but born afterwards, shall inherit as if he had been born in the decedent's lifetime.

that Levi be declared the father of Leah and that child support be ordered payable from Levi's estate. Elaine alleged that she became pregnant by Levi on June 13, 1986; that they were not married to each other; that Leah was born in Delaware on January 27, 1987; and that Levi was killed in the interim on October 2, 1986.

## II.

Under the paternity statute, the General Assembly declared in § 5–1002 that

"(1) this State has a duty to improve the deprived social and economic status of children born out of wedlock; and

(2) the policies and procedures in this subtitle are socially necessary and desirable.

(b) *Purpose.*—The purpose of this subtitle is:

(1) to promote the general welfare and best interests of children born out of wedlock by securing for them, as nearly as practicable, the same rights to support, care, and education as children born in wedlock;

(2) to impose on the mothers and fathers of children born out of wedlock the basic obligations and responsibilities of parenthood; and

(3) to simplify the procedures for determining paternity, custody, guardianship, and responsibility for the support of children born out of wedlock."

Section 5–1005(a) recognizes that "[a]n equity court may determine the legitimacy of a child pursuant to § 1–208 of the Estates and Trusts Article"; subsection (b) states that "paternity proceedings under this subtitle" are not limited "except after the legitimation of a child under this section." Section 5–1010, and ensuing sections, deal with the complaint against the putative father of the child born out of wedlock; they are couched in present tense terms, *i.e.*, of a putative father alive at the time that the paternity action is in process. Section 5–1032 provides that if the alleged father is determined by the court or jury to be the father, the court shall pass an order that so declares and "provides

for the support of the child." Section 5–1043 provides that if a father dies after he is judicially declared to be the child's father, or after he is ordered to make support payments, the court may, *inter alia*, summon the personal representative of the deceased father and order that an amount considered proper for the support of the child be paid from the estate.

### III.

In answer to interrogatories served upon her, Elaine stated that she first met Levi on August 24, 1985; that their sexual relationship began on October 9, 1985; that she saw Levi for the last time on July 20, 1986; and that during the time period in question, she did not have sexual relations with anyone other than Levi. Elaine admitted that Levi at one time questioned whether he was responsible for Elaine's pregnancy.[2]

Malkus moved to dismiss the paternity complaint on November 19, 1989. He claimed that the paternity statute has no application absent a judicial determination of parentage before the putative father dies; moreover, he contended that the right to child support, as claimed by Elaine, terminates upon the death of the parent. In opposition to the motion to dismiss, Elaine claimed that Leah would be denied equal protection of the law if § 5–1043 of the Family Law Article were construed to prevent her from establishing Levi's paternity posthumously.

On May 5, 1989, several weeks prior to the scheduled hearing on the motion to dismiss, Elaine filed a "Notice of Intent to Rely on Foreign Law," pursuant to Code (1989), § 10–504 of the Courts and Judicial Proceedings Article.

2. The record shows that, aside from Leah, Levi's only heir is his sister, Betty Brown, who is the life income beneficiary of a testamentary trust created under her mother's and brother's wills. The corpus of both trusts is payable to Levi's lineal descendants. In the event that Levi should die without lineal descendants, the trust corpus would be payable to collateral relatives, two of whom are serving as trustees of the trusts.

She thereby stated "her intent to rely on the law of the State of Delaware, with respect to the determination and adjudication of [Leah's] substantive rights to establish her status" as Levi's child.[3]

On Malkus's motion, Elaine's earlier filed declaratory judgment action was stayed pending determination of the paternity action. On May 23, 1989, the court (Goudy, J.) dismissed Elaine's paternity complaint. It considered only two issues: (1) whether Delaware or Maryland law should apply to the action and (2) whether the paternity action could be maintained after the putative father's death.

Noting the absence of Maryland precedent on the choice of law issue, the court relied upon the Restatement of Conflicts of Law § 454 (1934) and 10 Am.Jur.2d *Bastards* § 76 (1963) for the proposition that actions under what was formerly known as "bastardy or filiation" statutes of one state could not be maintained in another state. It, therefore, concluded that Maryland law would apply to this case.

The court also noted the lack of Maryland law regarding posthumous paternity proceedings. It recognized that the paternity statute provided for a continuance of the proceedings after the death of the father, but under limited circumstances. Specifically, the paternity statute, § 5–1043 of the Family Law Article, pertains to payment of child support from the deceased father's estate.[4] The court reasoned

---

**3.** Elaine has now filed an action in the Delaware courts to establish under the statutes of that state that Levi is Leah's father. That case has not as yet gone to trial.

**4.** Family Law Article § 5–1043 provides:

"(a) *Summons.*—If a father dies after a court declares him to be the father of a child or orders the father to make support payments under this subtitle, the court, on notification of the father's death, may issue a summons for:

(1) the personal representative of the father;

(2) the heirs of the father;

(3) the sureties on any bond the father may have given; and

(4) the mother or other person who has charge of the child.

"(b) *Payment from decedent's estate.*—(1) On proof of the amount of the deceased father's estate, the court may order that the amount the

that § 5–1043 "becomes relevant only after one or two triggering events ... either: (1) the court has already declared the putative father to be the father; or (2) the court has ordered the father to make child support payments." Because neither of these two prerequisites had occurred, the court concluded that the action could not proceed under § 5–1043.

The court then addressed Elaine's argument that the "Survival of Actions" statute, § 6–401(c) of the Courts Article, permits the action to continue notwithstanding Levi's death. That section, as the trial court correctly observed, "allows an equity action to continue after the death of the defendant if the court would be able to grant effective relief in spite of the death." Because the trial court believed that the only remedy provided by the paternity statute is the award of child support, it said that the issue was "whether the father's estate can be obligated to pay child support after the death of the father." As to this, the court held that the common law rule is that a court in equity does not have the power to require the payment of child support by a deceased father's estate, citing *Wooddy*

court considers proper for the support of the child be paid out of the estate.

(2) The court may not order paid from the deceased father's estate an amount that is more than:

 (i) one-half the amount that a child of the deceased father born in wedlock would receive; or

 (ii) one-half the amount the descendants of a child of the deceased father born in wedlock would receive as a class.

(3) Any money ordered to be paid from a deceased father's estate under this subtitle shall be charged as a debt against the estate." The revisor's note to this section states in part:

"The Commission to Revise the Annotated Code recommends that the General Assembly consider repealing this section, which provides that a father's duty to support a child born out of wedlock continues after the father's death. In situations where a child is born in wedlock, the common law applies and a parent's duty to support the child normally terminates with the parent's death. The common law rule also appears to apply to the obligation of a mother to support her child born out of wedlock. The essentially unique treatment of the father of a child born out of wedlock may raise constitutional questions."

*v. Wooddy*, 258 Md. 224, 232, 265 A.2d 467 (1970), and *Blades v. Szatai*, 151 Md. 644, 647–48, 135 A. 841 (1927). Reasoning that "statutes in derogation of common law will be strictly construed" and finding no expression of legislative intent contrary to the common law rule, the court determined that it was "powerless to grant relief as required by the Survival of Actions statute" and dismissed the complaint.

Elaine appealed to the Court of Special Appeals. We granted certiorari prior to argument before that court to consider the significant issue of public importance presented by the case.

## IV.

Before us, Elaine presents four questions: (1) whether Delaware or Maryland law applies to this action; (2) whether the constitutional guarantees of equal protection and due process of law require that posthumous paternity proceedings be encompassed under the Maryland paternity statute; (3) whether under the paternity statute, a deceased putative father's estate may be liable for child support to an afterborn child; and (4) whether a determination of paternity alone constitutes "effective relief," so that a posthumous paternity action may survive notwithstanding the death of the putative father.

Elaine's complaint seeks relief under the provisions of Maryland's paternity statute, namely, that the paternity of Leah be established under that statute, and that the court award child support to her pursuant to its provisions. As the answer to these issues turns upon the application of the Maryland Paternity Statute, Elaine's notice of intention to rely on the law of Delaware to prove her case is wholly inconsistent with the thrust of her complaint. Therefore, we find no error in the trial court's refusal to apply the law of that state.

As earlier noted, under § 1–208(b)(1) of the Estates and Trusts Article, a child born out of wedlock shall be con-

sidered the child of his father only if the father "[h]as been judicially determined to be the father in an action brought under the statutes relating to paternity proceedings."[5] Section 5–1005 of the paternity statute authorizes "[a]n equity court [to] determine the legitimacy of a child pursuant to § 1–208 of the Estates and Trusts Article." Thus, if Levi were judicially determined to be Leah's father in a proceeding authorized by § 1–208, she would be considered his child under § 1–205 and, as his lineal descendant under § 1–208(b)(1), would take under the provisions of Levi's and his mother's wills.

■ Section 5–1002 of the paternity statute recognizes the duty of the State "to improve the deprived social and economic status of children born out of wedlock." The statute's purpose, as expressed in this section, is in part "to promote the general welfare and best interests of children born out of wedlock by securing for them, as nearly as practicable, the same rights to support, care, and education as children born in wedlock." *See Commonwealth of Virginia v. Autry,* 293 Md. 53, 61, 441 A.2d 1056 (1982).

■ That § 1–208(b) of the Estates and Trusts Article is a legitimating statute is clear from our cases. *Bridges v. Nicely,* 304 Md. 1, 6, 497 A.2d 142 (1985); *Thomas v. Solis,* 263 Md. 536, 542, 283 A.2d 777 (1971); *Dawson v. Eversberg,* 257 Md. 308, 262 A.2d 729 (1970). In *Dawson,* 257 Md. at 315, 262 A.2d 729, we recognized the modern legislative policy of mitigating the impact of illegitimacy. *See also The Second Report of the Governor's Commission to Review and Revise the Testamentary Law of Maryland,* at 9 (1968). In *Thomas v. Solis, supra,* 263 Md. at 542, 283 A.2d 777, we said that "[t]he trend of the courts throughout

---

5. Elaine seems to concede that § 1–208(b)(2) and (3) are unavailable to establish Levi's paternity in this case because he never acknowledged in writing that he was Leah's father; or openly and notoriously recognized that he was responsible for Elaine's pregnancy. Subsection (4) is also unavailable because Elaine and Levi were never married.

the country is to give liberal interpretation to legitimation statutes or legislation which seeks to achieve that purpose." We are also mindful that "no right or privilege in the history of the common law, or in statutory law, is accorded greater sanctity than the right of inheritance." *Id.* at 542, 283 A.2d 777. Thus, we are in agreement with *Harris v. Brinkley,* 33 Md.App. 508, 514, 365 A.2d 304 (1976), that the provisions of § 1–208(b) do not exclude a posthumous illegitimate child from inheriting from the father.

Notwithstanding these principles, Malkus points out that the paternity statute does not, in express terms, authorize an action against a deceased putative father's personal representative. Malkus invites our attention to the fact that the paternity statute refers to the putative father in present tense terms as a "defendant"; from this he gleans a legislative intent to limit the action to a living putative father. Malkus also urges that the provisions of the paternity statute pertaining to notice, the issuance of a summons or warrant, the giving of bond, and the taking of blood tests, plainly indicate that the Legislature meant to apply the law only to living putative fathers. It is thus contended that § 1–208(b)(1) of the Estates and Trusts Article is restricted in its application to putative fathers alive at the time the paternity complaint is initiated.

Again and again, we have said that the cardinal rule of statutory construction is to ascertain and effectuate the legislative intention, *Harford County v. University,* 318 Md. 525, 529, 569 A.2d 649 (1990); *Jones v. State,* 311 Md. 398, 405, 535 A.2d 471 (1988). While the language of the statute is the primary source for determining legislative intent, *State v. Fabritz,* 276 Md. 416, 421, 348 A.2d 275 (1975), the plain meaning rule is not absolute. *Kaczorowski v. City of Baltimore,* 309 Md. 505, 513, 525 A.2d 628 (1987). Rather, the statute is to be construed reasonably with reference to the purpose, aim, or policies of the Legislature reflected in the statute. *Id.* Words in a statute must, therefore, be read in a way that advances the legislative policy involved. *Morris v. Prince George's Co.,* 319 Md.

597, 603–04, 573 A.2d 1346 (1990). And where two statutes purport to deal with the same subject matter, they must be construed together as if they were not inconsistent with one another. *Police Comm'r v. Dowling,* 281 Md. 412, 418, 379 A.2d 1007 (1977); *Comm'n on Md. Discipline v. Bendler,* 280 Md. 326, 330, 373 A.2d 1232 (1977). In this regard, the courts strongly favor a harmonious interpretation in construing the related statutes which gives full effect to both statutes, even where they were enacted at different times and without relation to one another. *Farmers & Merchants Bank v. Schlossberg,* 306 Md. 48, 56, 507 A.2d 172 (1986). Reading the provisions of the pertinent sections of the Estates and Trusts Article, in conjunction with the paternity statute, compels us to conclude that the circuit court was authorized to determine, in the paternity action, whether Levi was Leah's father, notwithstanding Levi's death prior to Leah's birth, and without regard to whether the court was empowered to make an award of child support against Levi's estate. As to the latter consideration, at oral argument before us, Elaine abandoned any claim for child support against Levi's personal representative.

Nothing in § 1–208 of the Estates and Trusts Article, or in the paternity statute, indicates a legislative intent to deny posthumous children the right to a declaration concerning their paternity. On the contrary, we think the legislative scheme, reading the two statutes harmoniously, is to provide a mechanism to assure that children born out of wedlock after the putative father's death may obtain a judicial determination of their paternity for purposes, *inter alia,* of establishing inheritance and other rights.[6]

---

**6.** We are, of course, aware of concern regarding fraudulent claims in posthumous paternity actions. This, however, does not outweigh the child's right to establish paternity. We note that the complainant in a paternity action bears the burden of establishing by a preponderance of the evidence that the alleged father is the father of the child. *See* § 5–1028(a) of the Family Law Article. *Dorsey v. English,* 283 Md. 522, 527, 390 A.2d 1133 (1978); *Smith v. Jackson,* 240 Md. 195, 198, 213 A.2d 491 (1965); *Ritter v. Danbury,* 15 Md.App. 309, 312, 290 A.2d 173 (1972); *Kimble v. Keefer,* 11 Md.App. 48, 50, 272 A.2d 668 (1971).

 Notwithstanding Levi's death before the action in this case was initiated, the circuit court was empowered by the paternity statute to declare whether Levi was the father of Leah. While complaints to establish paternity under the paternity statute may seek first, a declaration of paternity and second, an award of child support, the circuit court's authority to declare the former is not divested by not granting the latter. Thus, we see no reason why the circuit court, under the paternity statute, is not empowered simply to declare the putative father's paternity without making an award of child support.

In view of our conclusion, we need not address Elaine's other questions. We think an appropriate disposition of this case is to reverse the judgment below and remand the case to the circuit court, with directions to consolidate it with the pending declaratory judgment action, and thereafter to conduct further proceedings to determine, by a preponderance of the evidence, whether Levi is Leah's father.[7]

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR DORCHESTER COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY THE APPELLEE.

---

7. The record discloses that on July 8, 1988, Elaine and Malkus joined in a consent order to exhume Levi's body to obtain certain specimens for paternity testing; however, Levi's tissues had degraded to a point that satisfactory specimens could not be obtained.